Filed 8/24/22  P. v. Morales CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD MORALES,<br><br>    Defendant and Appellant. | E076748<br><br>(Super. Ct. No. FVA1301388)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

Defendant and appellant Edward Morales appeals from an order denying his petition to vacate his first degree murder conviction and obtain resentencing relief pursuant to Penal Code[1] section 1170.95. He claims the trial court improperly denied his petition because the court's ruling "is based on [independent] factual findings which the record does not show beyond a reasonable doubt that the jury decided under the instructions it received at trial." We disagree and affirm the order.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*[2]

During the early morning on July 26, 2013, Mr. Padilla was murdered. A neighbor testified that during the early morning hours of July 26, 2013, she heard someone say, "'Help me,'" and someone hitting another person. It sounded like someone was in pain. After 10 minutes it was quiet. The neighbor called the police.

At 5:12 a.m., Police Officer Stacey arrived at the street behind the neighbor's house, near Padilla's home. Officer Stacey found in the street a bloody shirt. He also found on Padilla's driveway a broken baseball bat, a water bottle, a laptop, a notepad, a pen, keys, and other items. Officer Stacey saw a lot of blood, suggesting a violent

---

[1] All future statutory references are to the Penal Code.

[2] The factual background is taken verbatim from this court's nonpublished opinion in defendant's direct appeal, case No. E070263. (*People v. Morales* (Feb 13, 2020, E070263) [nonpub. opn.] (*Morales I*), 2020 WL 726677.)

2

struggle. There was blood on a vehicle in the driveway, the garage, and the sidewalk leading into the backyard. There were also fresh tire tracks on Padilla's lawn.

Police officers entered Padilla's home in search of those who might have been seriously injured. Padilla's wife and two daughters told the police Padilla had left for work early that morning. Padilla's car, a black Nissan Versa, was gone and he was not answering his cell phone. The bloody shirt and other items strewn on the driveway belonged to Padilla. Padilla's family told the police defendant might be involved. Defendant was a former boyfriend of one of Padilla's daughters and had spent a substantial amount of time with the Padilla family. The two year relationship ended about a year before the murder.

At 10:00 p.m., on July 26, 2013, Police Officer Palmer was dispatched to Flores Park in Rialto, in response to a vehicle fire. Upon arriving, Officer Palmer saw a black car engulfed in flames. After the fire department put out the fire, a police field evidence technician examined the vehicle and found Padilla's body in the vehicle. His hands, chin, and neck were bound with duct tape. The technician also found in the car a pair of scissors, Padilla's employee identification card, and Padilla's wallet.

A forensic pathologist determined that Padilla had sustained burns, lacerations, and bruising to his body. His skull had several depressed fractures, indicating something struck his head and on the opposite side he had scalp contusions. In addition, Padilla had scratches and puncture wounds consistent with being stabbed with scissors. His left index finger, larynx and hyoid bone were fractured. The forensic pathologist concluded

3

Padilla died from a blunt force injury to the neck and head, with probable asphyxia from the hyoid and larynx fractures and from the binding around Padilla's head and neck. The forensic pathologist also concluded Padilla was not alive when his body burned because there was no soot in his airway.

Upon searching defendant's apartment, the police found blood on the carpet, and a bleach bottle and stain remover on the balcony. The police also searched defendant's car. The car was clean and the floor mats were missing. Blood was found on a seatbelt on the driver's side. During a search of Gonzalez's residence, the police found a hand gun in the rain gutter outside Gonzalez's bedroom. There was blood on the butt end of the gun, the gun barrel, and magazine chamber.

Police Officer Vantuinen, who assisted with the investigation, testified defendant gave him his cell phone during his second interview on August 1, 2013. Defendant told Vantuinen he was in possession of his cell phone the entire day of the murder on July 26, 2013. The police obtained phone data from defendant's cell phone. Sergeant Guthrie, the lead investigator in the case, testified defendant's cell phone data showed that defendant called Gonzalez on July 26, 2013, at 1:47 a.m. Then defendant and Gonzalez exchanged text messages at 2:48 a.m. At 5:32 a.m., defendant received a call from Gonzalez, causing defendant's cell phone to "ping" off a cell phone tower about halfway between Padilla's house and Flores Park.

B.S. testified she met defendant and Gonzalez through social media. In 2013, a few months after meeting defendant online, the police called B.S. This was shortly after

4

defendant had called B.S. and asked her to tell the police that he had been with her all night the previous night, which was untrue. Defendant told B.S. he wanted her to say this because he had been in a fight at a gas station. Defendant described his car for B.S. so she could confirm that information with the police. When B.S. spoke with the police a few minutes later, she said defendant had been with her all night at her home, until 7:00 a.m. on July 26, 2013.

A day or two later, the police met with B.S. and told her they were investigating defendant for murder. B.S. again said she had been with defendant during the night, which was false, but said she was with him only from 2:00 a.m. to 3:00 or 4:00 a.m., which was also false. After the police left, B.S. called defendant and told him about her encounter with the police. Defendant told B.S. he was involved in a fight, not murder. Then he gave the cell phone to his mother, who told B.S. there had not been a murder and that the police were trying to scare B.S. After B.S. said she did not want to be involved, B.S.'s mother sounded upset and told B.S. to keep quiet, lie, and not worry. About three weeks later, B.S. spoke to the police again and said defendant was not with her the night of the incident.

The police interviewed defendant three times. Officer Vantuinen interviewed defendant the evening of July 26, 2013, before Padilla's body was found. Defendant denied any involvement in Padilla's disappearance. Defendant claimed he had been with his female friend after leaving work the night before. During defendant's second

5

interview on August 1, 2013, at the police department, defendant again denied any involvement in the crimes against Padilla.

After the police spoke to defendant's brother, Victor, defendant was interviewed a third time on August 6, 2013. During his third interview, defendant initially denied involvement in the crimes, but later said he was forced to go to Padilla's home at gunpoint, and ran home when Gonzalez attacked Padilla. Defendant claimed his fingernail came off during a work-related accident. Later in the interview, he said it was pulled off during the altercation with Padilla, when defendant accidentally slammed it in a door. When Sergeant Guthrie confronted defendant with Victor's statement and the cell phone evidence, defendant admitted that two days before the killing, he and Gonzalez planned to rob Padilla. Defendant stated that Gonzalez told him that defendant was only going to drive Gonzalez there and Gonzalez was not going to touch Padilla or hit him.

Defendant told Sergeant Guthrie that, at 4:50 a.m., he and Gonzalez parked down the street from Padilla's house and walked to the side of Padilla's house. When Padilla exited his house, Gonzalez hit him with a baseball bat in the face and body so forcefully the bat broke. As Padilla tried to run away, he dropped all of his belongings and his shirt came off. Gonzalez hit Padilla with a gun multiple times, pushed him into Padilla's car, and told defendant to drive the car. When the car went into reverse, it went across the grass and up on the curb, hitting another vehicle. While defendant was driving, Gonzalez tied up Padilla and continued hitting Padilla so forcefully that defendant crashed into a

6

tow truck.  Defendant heard what sounded like Gonzalez choking Padilla or stabbing him in the neck with scissors.

While defendant was driving, Gonzalez inadvertently said defendant's name and Padilla seemed to recognize defendant's voice.  Padilla asked, "[W]hy?  Why Anthony?"  Defendant was known by his middle name, Anthony.  Gonzalez then hit Padilla multiple times with his gun.  Defendant believed Gonzalez killed Padilla because Padilla recognized defendant was involved and would likely figure out with whom defendant associated.  Gonzalez did not want any "loose ends."  Defendant heard Padilla breathing hard and saying, "I love you Lord, I love you Lord."  Defendant and Gonzalez took a few bloody hundred dollar bills from Padilla's wallet.

After 15 or 20 minutes, defendant and Gonzalez drove back to the area of Padilla's house and saw two squad cars.  Gonzalez got out of Padilla's car, retrieved defendant's car, and drove away.  Defendant then drove Padilla's car to Flores Park, with Padilla in the car.  Defendant abandoned Padilla's car containing Padilla's body at the park.  Defendant ran home, where he met Gonzalez.  Gonzalez retrieved his and defendant's clothes, put them in a plastic bag, and disposed of them.  Gonzalez went back to the park and burned Padilla's car.  Gonzalez or defendant's brother, Victor, cleaned defendant's car.  Victor disposed of defendant's shoes.  During his statement to Sergeant Guthrie, defendant said he deserved to die for what he had done.

7

B.  *Procedural Background*

In November 2016, a jury found defendant guilty of murder (§ 187, subd. (a); count 1), robbery (§ 211; count 2), carjacking (§ 215; count 3), and kidnapping to commit robbery (§ 209, subd. (b)(1); count 4).  The jury also found true the allegation that defendant knew that a principal was armed with a firearm during the commission of counts 2, 3, and 4 (§ 12022, subd. (d)).  The trial court sentenced defendant to 25 years to life in prison, and we affirmed defendant's judgment on direct appeal, without prejudice to defendant filing a petition in the trial court in accordance with section 1170.95. (*Morales I*, *supra*, E070263.)

On September 21, 2020, defendant filed a petition in the superior court requesting that his murder conviction be set aside under section 1170.95.  Defendant was represented by retained counsel, and following written briefing by the parties, the trial court found that defendant had made a prima facie showing of entitlement to relief and issued an order to show cause.  The court also set the matter for an evidentiary hearing and allowed the parties to submit additional briefing.

In their supplemental brief, the People argued that defendant was ineligible for relief because the evidence showed defendant aided and abetted the first degree murder and was a major participant who acted with reckless indifference to human life in light of his prior relationship with the victim, his violent participation in the kidnapping, and the prolonged nature of the commission of the underlying felonies in which his codefendant used deadly weapons.  Defendant filed a reply arguing that absent a jury's express

8

finding that would support guilt under the current statute, he was entitled to relief, and in any event, the evidence did not show that he could be guilty of murder under current law.

The evidentiary hearing was held on February 4, 2021. At that time, the trial court indicated that it was the People's burden to prove beyond a reasonable doubt defendant fell within one of the categories under section 189, subdivision (e), namely that defendant was the actual killer, that he aided and abetted with the intent to kill, or that he acted as a major participant in the underlying felony with reckless indifference to human life in the perpetration of the felony. The court then listed the items it considered in preparation for the hearing, which included this court's opinion on direct appeal, the record of the trial, including the jury instructions, verdict forms, and trial testimony. The court noted that even though it had presided over the trial and recalled the case, it nevertheless read the transcripts of the entire trial, read defendant's recorded statement and listened to the actual recording, and looked at all the exhibits, including the exhibit depicting the baseball bat used during the crime. The court inquired whether the parties wanted to present any additional evidence, and both parties responded in the negative.

Following lengthy arguments by the parties, the trial court found the prosecution had proven beyond a reasonable doubt that defendant was not entitled to relief. The court explained that, based on the evidence, the case was not strictly about a robbery or a robbery gone bad in light of the pre-existing relationship between defendant and the victim, defendant having had dated the victim's daughter, and the victim's involvement in their break-up. The court found that stealing the victim's property was secondary to

9

the attack on the victim because his laptop had been left at the scene. The court inquired, if the crime was meant to be only a robbery, "why did they leave the laptop? . . . why didn't they take everything of value. They took the victim, they didn't take all of his stuff." Although the court was not clear on who developed the plan, it appeared the crime may have started as a way for defendant to get revenge. The court discounted defendant's statements to the police because the detectives "assumed that this was a robbery that went bad" and that "defendant gave the detectives the interview that they sought based on their presumptions."

The court did not believe that the other perpetrator, Richard Gonzalez, "lost it" during the incident. Rather, the court explained that both Gonzalez and defendant had intended to engage in a "blitz attack" to cause either serious injury or death to the victim, and that although Gonzalez wanted the money, defendant wanted revenge as he had not gotten over his girlfriend, the victim's daughter. The court pointed out that a robbery could easily be accomplished by pointing a gun or weapon at someone and demanding money. While the crime here included a robbery, the court did not find that was the motive, "[i]t was about the beating and destruction of the victim; not about the money. At least not for [defendant]." The court explained that its inference was supported by the evidence that Gonzalez had a gun but chose to begin the attack on the victim with the bat, which would trigger a response from the victim. The court noted that by his own admission, defendant saw Gonzalez with the bat first, so he knew it was going to be used. The court further observed that defendant and Gonzalez had not planned to kidnap the

10

victim to take him to an ATM to take out more money, which further supported the finding that the primary intent was to assault the victim and only secondarily to rob him. The court stated, "In my opinion, the evidence confirms that this was an assault perpetrated by Richard [Gonzalez], but an assault that the defendant knew about, wanted, agreed with, and helped facilitate."

The court concluded that the prosecution had proven beyond a reasonable doubt that defendant "aided and abetted the willful, deliberate, and premeditated murder of the victim with the intent to kill." The court also found that "defendant was a major participant in the plan and execution of the plan to rob the victim" and that "defendant acted with reckless indifference to human life" when he participated in the beating, robbery, and kidnapping of the victim. Defendant timely appealed.

III.

DISCUSSION

Defendant contends the trial court erred in denying his petition because the court acted as an independent factfinder when it determined the current required elements of murder beyond a reasonable doubt that he intended to kill the victim and acted with reckless indifference to human life. He believes that a defendant who exercised his or her right to a jury trial "can be convicted only if a jury, as opposed to a court, makes findings as to the elements currently required for a murder conviction" and that any other interpretation of the statute is contrary to the language and purpose of section 1170.95, and it violates a defendant's Sixth Amendment right to a jury trial. We disagree.

11

A. *Standard of Review*

When the trial court applies its factual findings under a statute, we review the factual findings for substantial evidence. (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1086-1087 [trial court's factual finding that the defendant was ineligible for section 1170.95 relief because he was a major participant who acted with reckless indifference to human life reviewed for substantial evidence].) However, the interpretation and application of the statute to those factual findings is a question of law subject to de novo review. (*People v. Johnson* (2016) 1 Cal.App.5th 953, 960.)

We review questions of statutory interpretation de novo. (*People v. Lewis* (2021) 11 Cal.5th 952, 961 (*Lewis*).) As with any case involving statutory interpretation, our primary goal is to ascertain and effectuate the Legislature's intent. (*Ibid.*; *People v. Park* (2013) 56 Cal.4th 782, 796.) We begin by examining the statute's words, as the most reliable indicator of legislative intent, giving them a plain and commonsense meaning. (*Lewis*, *supra*, at p. 961; *People v. Law* (2020) 48 Cal.App.5th 811, 819.) "'"[W]e look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] That is, we construe the words in question '"in context, keeping in mind the nature and obvious purpose of the statute . . . ." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.'"'" (*Lewis*, *supra*, at p. 961.) "'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's

12

purpose, legislative history, and public policy.'" (*Mendoza v. Fonseca McElroy Grinding Co., Inc.* (2021) 11 Cal.5th 1118, 1125.)

B. *Senate Bill No. 1473*

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 846-847 (*Gentile*); see Stats. 2018, ch. 1015, § 1, subd. (f).) Senate Bill No. 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony-murder rule. (*Lewis*, *supra*, 11 Cal.5th at p. 957; *Gentile*, *supra*, at pp. 842-843, 847-848.)

New section 188, subdivision (a)(3), thus provides, "Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." New section 189, subdivision (e), limits the felony-murder rule exception to the malice requirement to circumstances where the People prove the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (§ 189, subd. (e)(3).)

13

Senate Bill No. 1437 also "added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief." (*Gentile*, *supra*, 10 Cal.5th at p. 843; see *Lewis*, *supra*, 11 Cal.5th at p. 959.) Pursuant to section 1170.95, an offender must file a petition in the sentencing court declaring that: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder [;] [¶] [and] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1170.95, subds. (a)(1)-(3); see also § 1170.95 subd. (b)(1)(A).)

The trial court then determines whether the petition is facially sufficient under section 1170.95, subdivision (b). (*Lewis*, *supra*, 11 Cal.5th at p. 960.) If the section 1170.95 petition contains all the required information, including a declaration by the petitioner that he or she was convicted of murder and could not now be convicted of murder because of changes to section 188 or 189 (§ 1170.95, subd. (b)(1)(A)), the court then must appoint counsel to represent the petitioner upon his or her request pursuant to section 1170.95, subdivision (c). (*Lewis*, *supra*, at pp. 957, 959-960, 966.) Further, upon the filing of a facially sufficient petition, the court must direct the prosecutor to file a

14

response to the petition and permit the petitioner to file a reply, and the court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (See § 1170.95, subd. (c); *Lewis*, *supra*, at pp. 964, 966.)

In determining whether the petitioner has made a prima facie showing, "'"the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause."' [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner."' [Citation.]" (*Lewis*, *supra*, 11 Cal.5th at p. 971.) Nonetheless, "[i]n reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Id*. at p. 972.)

If the petitioner makes a prima facie showing under section 1170.95, subdivision (c), the court must issue an order to show cause and hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts." (§ 1170.95, subd. (d)(1).) If a hearing is held, "'[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.'"

15

(§ 1170.95, subd. (d)(3); see *Gentile*, *supra*, 10 Cal.5th at p. 853.) Here, the parties chose to rely on the record of conviction and did not offer new or additional evidence. "At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).)" (*Lewis*, *supra*, 11 Cal.5th at p. 960.)

During this appeal, the Governor approved Senate Bill No. 775 (2021-2022 Reg. Sess.), which became effective on January 1, 2022. (Stats. 2021, ch. 551.) In pertinent part, this bill, amends section 1170.95 to "[c]odif[y] the holdings of *Lewis*[, *supra*,] 11 Cal.5th [at pp.] 961-970, regarding petitioners' right to counsel and the standard for determining the existence of a prima facie case" and to "[r]eaffirm[ ] that the proper burden of proof at a resentencing hearing under this section is proof beyond a reasonable doubt." (Cal. Const., art. IV, § 8; Stats. 2021, ch. 551, § 1.)

The amended provision also revised subdivision (d)(3) of section 1170.95, which now states: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited

16

in any prior appellate opinion.  However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.  A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.  If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."  (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551.)

C. *Analysis*

The issue in this case pertains to the trial court's role as a fact finder at the evidentiary hearing.  Specifically, the issue of whether a trial court acts as an independent factfinder and evaluates the evidence or whether section 1170.95 limits the trial court's decision to the jury's explicit findings to determine whether the petitioner is ineligible for resentencing because he or she is guilty of murder under the current laws beyond a reasonable doubt.

Initially, we note there is no dispute that defendant made a prima facie showing of eligibility under section 1170.95, subdivision (a).  There is also no contention as to whether the trial court correctly held the evidentiary hearing under section 1170.95,

17

subdivision (d). At the hearing stage, under section 1170.95, subdivision (d)(3), the statute shifts the burden to the People. As noted, the Legislature specified "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019 ." (§ 1170.95, subd. (d)(3).) To sustain their burden, the People may offer new or additional evidence, and subject to evidentiary rules, "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1170.95, subd. (d)(3).) In addition, "[t]he court may also consider the procedural history of the case recited in any prior appellate opinion" and the preliminary hearing, subject to the hearsay rules. (*Ibid.*) The trial court must resolve whether the People sustained their burden of proof, and if they have not done so it directs "the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1170.95, subd. (d)(3).)

Recently, this court in *People v. Clements* (2022) 75 Cal.App.5th 276 (*Clements*), concluded "the plain text of the statute requires the trial judge to sit as a factfinder, not as a quasi-appellate court," rejecting the trial court and the People's position that the trial judge decides whether substantial evidence supports a conviction under a still-valid theory. (*Id.* at 295.) We explained, "When interpreting the statute, we must attend to the Legislatures' clear purpose in section 1170.95, subdivision (d) of requiring a factfinding

18

at the ultimate hearing on the merits. Subdivision (d) specifies the purpose of the hearing is 'to determine whether the petitioner is entitled to relief' and places 'the burden of proof . . . on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' This plain language shows the People are required to establish the defendant is guilty under current law as a matter of fact and beyond a reasonable doubt. [Citation.] Applied to this case, the judge was required to determine whether the People satisfied their burden of proving beyond a reasonable doubt that Clements committed implied malice murder based on the evidence contained in the record of conviction." (*Clements*, *supra*, at p. 296.)

Based on our reasoning in *Clements*, we conclude that the trial court's role at the section 1170.95, subdivision (d) hearing is to act as an independent trier of fact and evaluate the evidence to determine whether the People satisfied their burden of proving beyond a reasonable doubt that defendant committed murder under the current laws. In analyzing the plain text and purpose of the statute, we disagree with defendant's interpretation that the trial court is limited in its determination based on findings made by a jury in the trial proceedings. Defendant's argument is contrary with the clear intent of the Legislature, as reflected by the plain language of section 1170.95. That section does not limit a trial court to only consider the jury's findings, but allows the court to review the evidence presented at trial, and even additional evidence presented at the hearing, to determine whether the People have proven beyond a reasonable doubt that petitioner committed murder under a still-valid theory. "The statute is explicit that either party

19

'may . . . offer new or additional evidence to meet their respective burdens.' (§ 1170.95, subd. (d)(3).) Under our interpretation, the judge simply reviews the record, hears the testimony, and decides as a factual matter whether the petitioner committed murder under the current law." (*Clements*, *supra*, 75 Cal.App.5th at p. 297.)

Although it is "unusual to ask the trial judge to sit as the fact finder and (in some cases) make factual determinations on a cold record, . . . it is possible to review a trial transcript and reach an opinion about what actually happened. The Legislature landed on that compromise as a way of extending the ameliorative benefits of its redefinition of murder to people previously convicted under prior law, which they judged to be too harsh. They could have directed that qualifying offenders receive a new trial by a new jury on the critical factual questions. But that was impractical for many reasons; the expense would have been enormous and the chances of obtaining live testimony from witnesses who remembered the events from years or decades earlier is small. The Legislature also could have simply refused to make the benefits of the new law available to people already validly convicted under the old law. They chose the middle course of requiring trial judges to decide the critical factual questions based—at least in some cases—on a cold record. While the Legislature's compromise is not perfect, it is adequate. And if either party believes it's important to put on live testimony to allow the trial judge to make credibility determinations based on cues other than consistency and plausibility, the statute expressly allows them that opportunity." (*Clements*, *supra*, 75 Cal.App.5th at p. 297.) "Of course, in a section 1170.95 petition, the trial judge isn't

20

charged with holding a whole new trial on all the elements of murder. Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder." (*Id.* at p. 298.)

Defendant's interpretation of the statute is contrary to the Legislature's intent. Nothing in section 1170.95 limits a trial court to the factual findings already rendered by a jury in determining whether the People have shown a petitioner is guilty under current law as a matter of fact and beyond a reasonable doubt. Section 1170.95, subdivision (d)(1) states "the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence. . . ." And subdivision (d)(2) of that statute explicitly accounts for a situation where there was a prior finding by a court or a jury that would render a defendant eligible for relief as a matter of law. Specially, that provision, in relevant part, states "If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." (§ 1170.95, subd. (d)(2).) Absent from either provision is any direction to a trial court to consider the absence of particular jury findings in determining whether relief should be granted. What is more, by allowing the parties to allow new or additional evidence, the Legislature anticipated that the trial court would be considering the petition beyond the jury's explicit findings. We do not believe the Legislature intended the trial court to merely evaluate the jury's findings or grounds on which the original verdict was rendered. And we are reluctant to find so in

21

the "[a]bsen[ce of] a clear expression of legislative intent." (See e.g., *People v. George* (1984) 157 Cal.App.3d 1053, 1057-1058.)

Moreover, in examining the purpose inspiring section 1170.95 convinces us that subdivision (d)(3) turns a petitioner's entitlement to relief on whether the trial court itself finds, beyond a reasonable doubt, that defendant is guilty of murder on a still-valid theory of liability. This is the outcome most consistent with our Legislature's stated purpose to extend Senate Bill No. 1437's new rules in an equitable fashion both prospectively and retroactively. In the introductory legislative "findings" of Senate Bill No. 1437, our Legislature declared that its purpose was to more closely align the punishment for murder with a person's "own level of individual culpability." (Stats. 2018, ch. 1015, § 1(d), (e); *Gentile*, *supra*, 10 Cal.5th at pp. 845-846.) Furthermore, by simultaneously amending the statutes defining murder and creating the procedural mechanism in section 1170.95 to revisit already existing murder convictions, our Legislature confirmed that this purpose was designed to benefit both past and future offenders. Where, as here, there is an avowed purpose to grant ameliorative relief "prospective[ly] and retrospective[ly]," the best way to effectuate that purpose is to give the requirements for all relief a "parallel construction." (*People v. Frierson* (2017) 4 Cal.5th 225, 236.) This principle of parallel construction here leads unavoidably to the conclusion that the People must convince the trial court, as an independent trier of fact, that the petitioner is guilty of murder on a still-valid theory beyond a reasonable doubt.

22

If the People may obtain a murder conviction under the amended statutes in the future only by proving beyond a reasonable doubt that the defendant was the actual killer, acted with the intent to kill or was a major participant acting with reckless indifference to human life, then section 1170.95 should be read to require the People to preserve a past murder conviction by proving any of those same facts to the trier of fact beyond a reasonable doubt. Under this interpretation, the sole difference between the two is that to obtain future convictions the proof must be made to a jury, while the showing to preserve past convictions may be made to the court. However, that difference is simply because the constitutional right to a jury trial does not attach in the latter situation, where what is at issue is a possible entitlement to a reduced sentence rather than the initial imposition of criminal liability. (*People v. Perez* (2018) 4 Cal.5th 1055, 1063-1064; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 ["[T]he Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights"].) For this reason, we reject defendant's Sixth Amendment constitutional right-to-a-jury-argument. Petitioners filing section 1170.95 petitions are not criminal defendants charged anew with murder entitling them with the constitutional right to a jury. Senate Bill No. 1437 is an act of lenity and does not implicate a defendant's constitutional rights. As such, the Sixth Amendment right to a jury does not prohibit trial courts from relying on facts not found by a jury in determining section 1170.95 eligibility.

Defendant contends that the incorporation of the beyond-a-reasonable-doubt standard in subdivision (d)(3) of section 1170.95 suggests that the trial court's findings

must be limited to what the jury found in the underlying trial. We find this contention unpersuasive. The language "beyond a reasonable doubt" refers to the well- established standard of proof the prosecution must prove in criminal cases. (See Evid. Code, § 115.) "The function of a standard of proof . . . is to 'instruct the factfinder concerning the degree of confidence our society thinks he [or she] should have in the correctness of factual conclusions for a particular type of adjudication.'" (*Addington v. Texas* (1979) 441 U.S. 418, 423, quoting *In re Winship* (1970) 397 U.S. 358, 370; accord, *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546.) "The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." (*Addington v. Texas*, *supra*, at p. 423; accord, *Santosky v. Kramer* (1982) 455 U.S. 745, 755 [The required minimum standard reflects a "societal judgment about how the risk of error should be distributed between the litigants."].)

Moreover, section 1170.95, subdivision (d)(3), as amended, demonstrates a clear Legislative intent that the trial court is not limited to considering the jury's explicit findings in determining whether a defendant is entitled to relief. The amended provision specifically references the admission of evidence at the hearing stage and the means by which the Evidence Code applies to the proceedings. And the new provision, despite the Evidence Code, states that the "court may consider" previously admitted evidence at any hearing or during trial that is presently admissible as well as the procedural history recited in any prior appellate opinion. (§ 1170.95, subd. (d)(3).) The amended section

also references the preliminary hearing, allowing a consideration of that hearing, subject to the hearsay rules.  (*Ibid.*)

Defendant expends a lot of time analyzing cases where murder convictions were challenged on direct appeal and whether any error was harmless beyond a reasonable doubt.  (See, e.g., *People v. Chiu* (2014) 59 Cal.4th 155, 167; *People v. Chun* (2009) 45 Cal.4th 1172, 1203; *Chapman v. California* (1967) 386 U.S. 18, 24.)  However, those cases are inapposite as section 1170.95 was not at issue.  In contrast to those cases, the instant case does not involve a direct appeal from defendant's murder conviction itself.  Rather, defendant is appealing from the trial court's order denying his section 1170.95 petition for resentencing relief.  The statutorily standards for granting or denying the resentencing petition are quite different than the standards applicable for determining harmlessness on direct appeal.  Those differences are material.  First, the harmless error line of cases requires courts to inquire whether "there is a basis in the record to find that the verdict was based on a valid ground."  (*People v. Chiu*, *supra*, 59 Cal.4th p. 167.)  That reverse analysis is inconsistent with section 1170.95, subdivisions (a)(3)'s and (d)(3)'s explicit direction to the trial court to determine if the petitioner could *now* be convicted of murder under current sections 188 and 189 as amended, not whether he or she was, in fact, convicted of murder under a still valid theory.  Second, subdivision (d)(3) permits both parties to present new or additional evidence at the evidentiary hearing after issuance of an order to show cause.  If the trial court's ineligibility ruling may be based on evidence not heard by the original trier of fact, the Legislature cannot

have intended the court simply to evaluate the grounds on which the original verdict was reached. Lastly, section 1170.95 is available to defendants convicted of murder following a plea in lieu of a trial, and it would be impossible to evaluate whether a still-valid ground for a murder conviction existed in those cases, given the limited record in many plea cases. Nevertheless, section 1170.95 contemplates the same procedure to determine ineligibility in plea matters as in cases with a jury trial.

We also reject defendant's reliance on subdivision (g) of section 1170.95 to support his position. That section, which was added by Senate Bill No. 775, states "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to [s]ections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)." (§ 1170.95, subd. (g).) While defendant is correct that a court would be constrained on direct appeal to the record, his case is not on direct review and has been long final. Furthermore, as explained above and noted by the People, the Legislature has provided a specific process for those petitioners whose cases have been final and clearly intended to treat those petitioners differently.

We conclude that the trial court's role at the section 1170.95, subdivision (d) evidentiary hearing is to act as an independent trier of fact and evaluate the evidence to determine whether the People satisfied their burden of proving beyond a reasonable doubt that defendant committed murder under a still-valid theory. Viewed in its entirety, the

26

transcript of the evidentiary hearing demonstrates the trial court engaged in appropriate and independent factfinding and applied the proper reasonable doubt standard.

## IV.

## DISPOSITION

The order denying defendant's section 1170.95 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

MILLER
Acting P. J.

MENETREZ
J.